J-A19026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.F.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 764 EDA 2021 |

Appeal from the Decree Entered March 30, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000142-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.F.G.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 765 EDA 2021 |

Appeal from the Order Entered March 30, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-DP-0001524-2019

BEFORE: DUBOW, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.: **FILED OCTOBER 26, 2021**

K.F. (Mother) appeals from the decree involuntarily terminating her parental rights to her son, M.F.G. (Child), and the order changing Child's

_____

[*] Retired Senior Judge assigned to the Superior Court.

permanency goal from reunification to adoption.[1]  Upon careful review, we affirm the decree and dismiss the appeal from goal change as moot.

Child was born in August 2019.  On September 2, 2019, the Philadelphia Department of Human Services (DHS) received a protective services report alleging Child was in the neonatal intensive care unit at Temple University Hospital due to respiratory distress and needed to be monitored after being born with fentanyl in his system.  **See** Trial Court Opinion, 5/13/21, at 3 (record citation omitted).  The report also alleged that Mother had tested positive for fentanyl, suboxone, benzodiazepines, and subutex at Child's birth. **Id.**

After multiple attempts to locate Mother and Father, DHS first communicated with them by telephone on September 20, 2019, when the parents visited Child at the hospital.  Mother and Father stated that they were transient and had been residing at a hotel since August 2019.  **Id.** at 3-4.  The hospital discharged Child on September 20, 2019, and he was placed in foster care pursuant to an order of protective custody.  **Id.** at 5.  By order dated September 23, 2019, the court placed Child in shelter care.  The order further

_____

[1] The court issued separate decrees terminating the parental rights of J.G. (Father), as well as the unknown father.  Father has appealed the court's rulings regarding goal change and termination, at docket 750 & 751 EDA 2021, which this Court consolidated sua sponte.  We address Father's appeal by separate memorandum.  The unknown father did not appeal.

provided Mother and Father with supervised visitation twice a week, and required that they be drug-tested.

On October 3, 2019, following a hearing, the court adjudicated Child dependent and continued Child's placement in foster care. The court maintained parents' weekly supervised visitation for two hour periods. The court referred Mother and Father to the Clinical Evaluation Unit (CEU) for a mental health and drug/alcohol assessment, with three random drug screens to occur before the next hearing. In addition, the court referred Mother and Father to the Achieving Reunification Center (ARC) to obtain services related to parenting, housing, employment, and personal finance. Trial Court Opinion, 5/13/21, at 6 (citing Order of Adjudication and Disposition, 10/3/19).

Thereafter, the Community Umbrella Agency (CUA) established a single case plan (SCP) for Mother which was discussed with Mother during a meeting in late October 2019. *Id.* at 6; N.T., 3/30/21, at 12. The SCP identified Child's permanency goal as reunification. In furtherance of the goal, Mother was to address mental health and drug/alcohol concerns; address Child's medical issues; locate suitable housing; "increase her relationship with Child"; and engage in ARC services. *Id.* at 7.

Following a status review hearing on January 16, 2020, Judge Fernandes again ordered Mother and Father—because they had not yet done so—to obtain a mental health and drug/alcohol assessment by the CEU. Trial Court Opinion, 5/13/21, at 7. On February 6, 2020, the court conducted a

permanency review hearing. That same day, the court entered an order finding Mother and Father had minimally complied with their SCP, and had made no progress toward alleviating the circumstances which necessitated Child's placement. The court also repeated its directive that the parents were to engage in ARC parenting, housing, employment, and personal finance programs. Further, the court directed CUA to provide Mother with transportation to appointments for programs and services, as well as court-ordered drug screens and supervised visits with Child. *Id.* at 8. The CUA met with Mother and Father on April 20, 2020 and July 7, 2020, and reiterated and reviewed Mother's objectives and the permanency goal of reunification. *Id.* at 8-9.

The next review hearing occurred on September 22, 2020. Afterward, the court entered an order indicating Mother had obtained a drug/alcohol assessment which recommended intensive outpatient treatment; however, Mother had not obtained treatment, and the court ordered CUA to assist Mother in doing so. The court further found Mother was discharged twice from ARC for non-attendance, and she still lacked suitable housing. Finally, the court found Mother had declined virtual visits with Child from March to August 2020, when in-person visits were prohibited due to COVID. N.T., 3/30/21, at 20.

On January 29, 2021, the CUA held another SCP meeting with Mother (and Father) and repeated and reviewed objectives and the permanency goal of reunification. *Id.* at 10.

On March 11, 2021, DHS filed an involuntary termination petition as to Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and a petition seeking to change Child's permanency goal to adoption. The court convened a combined hearing on the petitions on March 30, 2021. Child, who was approximately 18 months old, was represented by Deborah Fegan, Esquire, serving as guardian *ad litem* (GAL).[2] DHS presented testimony from CUA case manager, Anaya Roberts. Mother and Father testified on their own behalf. At the conclusion of the hearing, the court stated its findings on the record. *See* N.T., 3/30/21, at 80-83. The court commented:

> [T]here is a similarity of a narrative running through the [parents'] cases and it goes something like this: Mother and [F]ather not engaged[.] [M]other and [F]ather not complying with requirements[.] [M]other and [F]ather did not engage with ARC, did not engage with CEU, did not engage with mental health [services.] [M]other and [F]ather do not have housing.
>
> That narrative began back in 2019, and I heard the same testimony today. Mother and [F]ather still do not have housing. **Mother and [F]ather had failed to submit any evidence that they have rectified any of the issues that brought [C]hild into care**.

N.T., 3/30/21, at 81 (emphasis added).

_____

[2] The GAL has joined DHS's brief advocating for affirmance.

The court entered a decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and an order changing Child's permanency goal to adoption. Mother timely filed a notice of appeal from the decree on the adoption docket, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b); Mother also filed a notice of appeal from the order on the dependency docket, along with a concise statement of errors complained of an appeal. This Court consolidated Mother's appeals *sua sponte*. The trial court entered a Rule 1925(a) opinion on May 13, 2021.

Mother presents four issues, which we have re-ordered for disposition as follows:

1)    Whether the trial court abused its discretion and erred as a matter of law in terminating [M]other's parental rights in that it violated the [o]rders of Judge Walter J. Olszewski which ordered that lack of treatment or services due to inability to access them during the COVID pandemic would not be considered as a lack of compliance and tolled the deadlines for filing termination petitions from March 16, 2020, until the order was lifted, which has not been done to date[?]

2)    Whether the trial court abused its discretion and erred as a matter of law in terminating [M]other's parental rights when DHS failed to meet its burden that termination of parental rights was warranted under 23 Pa.C.S.A. § 2511(a) and (b)[?]

3)    Whether the trial court abused its discretion and erred as a matter of law in terminating [M]other's parental rights when DHS failed to meet its burden that termination of parental rights best served [C]hild's developmental, physical and emotional needs and welfare as required by 23 Pa.C.S.A. § 2511(b)[?]

- 6 -

4)    Whether the trial court abused its discretion and erred as a
      matter of law in terminating the permanency goal to
      adoption from reunification there was not competent
      evidence that it was in the best interests of [C]hild[?]

Mother's Brief at 8-9.

We begin by recognizing,

The standard of review in termination of parental rights cases
requires appellate courts to accept the findings of fact and
credibility determinations of the trial court if they are supported
by the record. If the factual findings are supported, appellate
courts review to determine if the trial court made an error of law
or abused its discretion. A decision may be reversed for an abuse
of discretion only upon demonstration of manifest
unreasonableness, partiality, prejudice, bias, or ill-will. The trial
court's decision, however, should not be reversed merely because
the record would support a different result. We have previously
emphasized our deference to trial courts that often have first-hand
observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted). Similarly, we

review goal change orders for an abuse of discretion. *In re R.M.G.*, 997 A.2d

339, 345 (Pa. Super. 2010) (citation omitted).

Termination of parental rights, set forth in Section 2511 of the Adoption

Act at 23 Pa.C.S.A. §§ 2101-2938, requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party
seeking termination must prove by clear and convincing evidence
that the parent's conduct satisfies the statutory grounds for
termination delineated in Section 2511(a). Only if the court
determines that the parent's conduct warrants termination of his
or her parental rights does the court engage in the second part of
the analysis pursuant to Section 2511(b): determination of the
needs and welfare of the child under the standard of best interests
of the child. One major aspect of the needs and welfare analysis
concerns the nature and status of the emotional bond between
parent and child, with close attention paid to the effect on the child

of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we address termination under Section 2511(a)(8) and (b), which provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must determine whether the conditions that led to removal continue to exist, despite the reasonable good faith efforts of the child welfare agency over a realistic time period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of the agency's services. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

The court must also consider whether termination would serve the child's needs and welfare. *In re Adoption of M.E.P.*, *supra* at 1275-76. The needs and welfare analysis is relevant to both Sections 2511(a)(8) and (b). We have explained,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8) prior to addressing the "needs and welfare" of [the child], as prescribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (citations omitted).

With respect to Section 2511(b), "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

With regard to goal change, Section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f) (Disposition of dependent child), controls. We have explained:

> Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011) (citations omitted).

In her first issue, Mother contends the trial court abused its discretion and/or erred in terminating her rights in violation of administrative orders in the Court of Common Pleas of Philadelphia County, Family Division, Juvenile Dependency Branch, dated April 16, 2020 and August 25, 2020, relating to dependency cases during the statewide judicial emergency caused by COVID-19.[3]

The April 16, 2020 order directed that in-person supervised visitation be modified to virtual visitation. The order further provided that a parent's inability to access treatment or services "due to provider closures . . . **shall not** be interpreted as a lack of compliance with court-ordered services or treatment and/or permanency plan objectives." Order, 4/16/20, at 3 (emphasis in original). In addition, the order directed DHS/CUA to "provide reasonable efforts to ensure" a parent is "able to meaningfully participate in mandated services" during the pandemic, including, but not limited to, "[i]nquiring actively about, and closely monitoring, the availability of treatment and other services." *Id.* Finally, the order provided:

> Consistent with the Order of the Supreme Court of Pennsylvania, which, in pertinent part, tolled judicial timelines during the statewide judicial emergency, all judicial timelines established

---

[3] On March 16, 2020, the Pennsylvania Supreme Court issued an order declaring a statewide judicial emergency until April 14, 2020. The Supreme Court also authorized president judges in each judicial district to declare a local judicial emergency. On March 18, 2020, the Pennsylvania Supreme Court declared a judicial emergency in all districts, and closed all courts to the public, subject to certain exceptions, until at least April 3, 2020. The Court subsequently extended the statewide judicial emergency to June 1, 2020.

under the responsibility of DHS for filing termination petitions . . .
pursuant to . . . 42 Pa.C.S.A. § 6351(f)(9) for purposes of
involuntary termination of parental rights under the Adoption Act,
. . . are TOLLED from the date of March 16, 2020 until the date on
which this Order is lifted by the Court.

Order, 4/16/20, at 3. The August 25, 2020 order directed that in-person visits may recommence, *inter alia*, and included the above provisions from the April 16, 2020 order.

Based on these provisions, Mother argues "because of the orders tolling the judicial timelines and because the caseworker fail[ed] to provide the active and close monitoring required by the orders," the involuntary termination decree and goal change order "were in violation of the [administrative] orders. . . ." Mother's Brief at 32-33. The record does not support this argument.

First, Mother did not raise any issues pertaining to the administrative orders prior to or at the termination hearing. Issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a). In ***Jahanshahi v. Centura Development Co., Inc.***, 816 A.2d 1179 (Pa. Super. 2003), we referenced the Supreme Court's emphasis on raising claims at the earliest opportunity to "eliminate the possibility that an appellate court will be required to expend time and energy reviewing claims on which **no trial ruling has been made**." ***Id.*** at 1189 (emphasis in original) (citation omitted). Furthermore:

On appeal, we will not consider assignments of error that were not
brought to the tribunal's attention **at a time at which the error
could have been corrected** or the alleged prejudice could have
been mitigated. ***Tindall v. Friedman***, 970 A.2d 1159, 1174 (Pa.

Super. 2009). "In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter." ***Id.*** (quoting ***Thompson v. Thompson***, 963 A.2d 474, 475-46 (Pa. Super. 2008) (citation omitted)).

***State Farm Mutual v. Dill***, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*) (emphasis added). Thus, we find the issue waived.

However, even if not waived, the issue lacks merit. Mother cites no evidence to indicate the administrative orders (or the COVID pandemic) meaningfully impacted her actions and the trial court's dispositions. Based on our review of the record, reasonable efforts were made to assist Mother in complying with her SCP objectives during the judicial emergency. As the trial court explained,

> This [c]ourt followed the directive administrative orders from the supervising judge of family court regarding visitation and mandated services. The[ administrative] orders also provided a mechanism for parents who allege reasonable efforts have not been made to ensure visitation. Parents may petition the [c]ourt for a contested hearing through advanced communication technology to discuss any issues. (J. Olszewski – Amended Order, 4/16/20; J. Olszewski – Amended Order, 8/25/20).
>
> In this case, Mother did not petition [the c]ourt for a resolution of any issues regarding visitation or lack of services that occurred. Instead, Mother refused virtual visitation because she believed it was not appropriate for her one-year-old child. Regarding Mother's lack of an ability to access services due to provider closures during the pandemic, [the c]ourt finds that Ms. Roberts' testimony was credible, clear and convincing that DHS/CUA provided reasonable efforts to ensure that Mother was able to access and participate in mandated services.

Trial Court Opinion, 5/13/21, at 21. The court further observed that "Mother has a history dating back to when Child began supervision, of noncompliance [with her SCP objectives,] and Mother continued her noncompliance before and after COVID-19. *Id.* at 22. We agree.

Ms. Roberts, the CUA caseworker, testified Mother was offered supervised virtual visitation from March 2020 to August 2020, but declined virtual visits because she "did not believe virtual visits were quality visits with a one-year-old." N.T., 3/30/21, at 20. Ms. Roberts acknowledged the pandemic hindered Mother's compliance with SCP objectives from March to June 2020 because "a lot of programs went virtual." *Id.* at 39-40. Nevertheless, from the outset of this case in September 2019, prior to the pandemic, Mother was court-ordered to obtain an assessment from the CEU, and she had not complied when the judicial emergency occurred approximately six months later. Mother did not complete an assessment until July 22, 2020. N.T., 3/30/21, at 47.

Ms. Roberts also testified she twice referred Mother to ARC for services prior to the judicial emergency, on October 3, 2019 and February 10, 2020. *Id.* at 50. The referrals were unsuccessful, as Mother "was discharged twice for non-attendance." Trial Court Opinion, 5/13/21, at 10. It was not until Ms. Roberts referred Mother to ARC on January 20, 2021 that Mother began to participate in services. *Id.* at 18. Accordingly, even if Mother's first issue was

not waived, it would not warrant relief, as Mother's noncompliance pre-dated the COVID pandemic and continued after restrictions were lifted.

In her second issue, Mother once again invokes the COVID pandemic in arguing the court erred in terminating her parental rights pursuant to Section 2511(a)(8). Mother contends the "last 12 months before the filing [of] the petition span the COVID-19 pandemic which hindered [her] ability to comply with her mental health and drug and alcohol treatment, hindering her ability to be compl[i]ant through no fault of her own." Mother's Brief at 25-26. Contrary to Mother's assertion, the 12-month statutory time frame concerns the number of months that "elapsed from the date of removal or placement," not the number of months prior to the filing of the termination petition. *See* 23 Pa.C.S.A. § 2511(a)(8). Here, Child was removed and placed in September 2019, shortly after his birth, and six months prior to the pandemic. Also, DHS did not petition for termination until March 11, 2021—a year after the pandemic began, and approximately 18 months after Child's placement.

As discussed above, Ms. Roberts testified that COVID limitations notwithstanding, Mother failed to comply with her objectives before and after COVID. For example, after repeated court directives, Mother eventually obtained a mental health and drug/alcohol assessment on July 22, 2020, which resulted in the recommendation that Mother participate in intensive outpatient treatment. N.T., 3/30/21, at 47. However, Mother did not follow up with treatment. *Id.* at 13-16. Although Mother told Ms. Roberts she was

attending a program, the documentation Ms. Roberts received from the program revealed Mother had only an intake appointment, in 2019, but never received treatment. *Id.* at 14-16. Ms. Roberts opined that mental health and drug/alcohol treatment remained an objective for Mother. *Id.* at 15.

Ms. Roberts further testified to referring Mother to parenting, housing, employment, and financial counseling services—prior to the judicial emergency, and without success on Mother's part—on October 3, 2019 and February 10, 2020. N.T., 3/30/21, at 17-18, 50. Following Ms. Roberts' post-COVID referral on January 20, 2021, Mother engaged in services with some success. *Id.* at 18. Yet when asked whether she believed Mother was "in a position to care for [Child] in the next three, six months? Do you see [M]other putting herself in a position to care for him?", Ms. Roberts answered, "Not at this time." *Id.* at 25.

Finding Ms. Roberts credible, the trial court explained:

Regarding housing, Ms. Roberts testified Mother received a referral to ARC for housing on 10/02/2019; however, she was discharged on 10/24/2019 for unsuccessful engagement. Another referral to ARC was made on 2/10/2019, and she was again discharged on 4/20/2020, due to unsuccessful outreach. Another referral was made for Mother to ARC on 1/20/2021, and she completed an assessment. Mother has lived and continues to live in hotels in the area, currently residing in a hotel in Trevose, PA. Ms. Roberts reported that . . . [Father] was paying for the hotel in the past; however, Mother was now going to [c]ourt to fight eviction from the hotel. Ms. Roberts testified she contacts Mother weekly and last spoke to her on Thursday; however, Mother did

not inform her of another change of address,[4] and Mother remains transient.

Regarding Mother's employment, Ms. Roberts testified that Mother does not report any income and does not have an explanation of how she would prepare a plan financially for caring for Child.

Regarding visitation, Ms. Roberts testified th[at] visitation has always been supervised, and Mother has never requested a change to unsupervised. In 2019, and early 2020, [c]ourt-ordered visitation was two hours supervised visits, once a week, and Mother was consistent with visits. When the pandemic began in March 2020 to August 2020, Mother was offered virtual visits through Zoom with Child, the resource parent, and the CUA Case Manager. However, Mother declined the virtual visits from March to August 2020, stating she did not believe virtual visits were quality visits with a one-year-old. Ms. Roberts testified during the period between March to August 2020, Mother was contacting the resource parent herself once a week or every two weeks to see how her son was doing. Supervised in-person visitation was reinstated in August of 2020, and Mother began visiting Child . . .

Trial Court Opinion, 5/13/21, at 15 (citing N.T., 3/30/21, at 16-22).

Although Mother had begun supervised in-person visitation, Ms. Roberts testified that Mother was not "in a position" to care for Child. N.T., 3/30/21, at 25. Accordingly, the evidence supports the court's determination, consistent with Section 2511(a)(8), that Child had been removed from

---

[4] During the hearing, Mother's counsel stated that Mother no longer resides at the hotel in Trevose, Pennsylvania, and Ms. Roberts testified that Mother was transient. N.T., 3/30/21, at 16, 18.

Mother's care for more than 12 months, and the conditions which led to Child's removal or placement continue to exist.[5]

In her third issue, Mother argues the court erred in terminating her parental rights pursuant to Section 2511(b). Pertinently:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

The Pennsylvania Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court also directed that in

_____

[5] Mother continues to emphasize COVID, stating that services "were unfairly limited" due to the pandemic. Mother's Brief at 26. Mother asserts, "given additional reasonable time, many of the conditions which brought [C]hild into care could have been alleviated and DHS did not meet its burden." *Id.* at 25. We have scrutinized the record, and for the reasons discussed throughout this memorandum, find no merit to Mother's COVID-related claims.

weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

Here, the trial court stated:

> This [c]ourt heard credible, persuasive testimony from Ms. Roberts who testified she sees Child at the foster home once a month. He has been at this same home since December 2019 and is bonded to the resource parent. . . . Ms. Roberts noted that Child looks to the resource parent to meet all of his developmental, emotional, medical and daily needs. He has a parental relationship with the resource parent and a minimal relationship with his birth mother. Regarding visitation, Ms. Roberts noted that Mother visits Child once a week one hour. She testified Mother is not in a position to care for Child. Ms. Roberts opined Child would not be irreparably harmed if Mother's parental rights were terminated and Child [was] adopted by the pre-adoptive resource parent.

Trial Court Opinion, 5/13/21, at 19.

The record supports the trial court's findings. Ms. Roberts testified Child's bond with Mother is "very minimal," and compared Mother's relationship with Child to that of an aunt. N.T., 3/30/21, at 24. She further stated that Child has resided with his foster mother since December 2019, and she is a pre-adoptive resource. *Id.* at 10, 31. Ms. Roberts testified Child "runs" to his foster mother and looks "to her for comfort." *Id.* at 23.

To the extent Mother asserts "Ms. Roberts testified that Mother and [C]hild have a bond and that [C]hild loves [M]other and calls her mom-mom.

(N.T., 3/30/21, [at] 20-22).", the characterization is out of context. The following exchange occurred during cross-examination of Ms. Roberts by Mother's counsel:

COUNSEL: And [C]hild [refers] to [Mother] as mom-mom, correct?

A. When encouraged.

N.T., 3/30/21, at 48. Importantly, Ms. Roberts testified that Child calls his foster mother "Mama." *Id.* at 32. The totality of Ms. Roberts' testimony reveals Child has a parent-child bond not with Mother, but with his foster mother. *Id.* at 24.

In sum, the record supports the court's conclusion that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Child pursuant to Section 2511(b).

In her fourth and final issue, Mother argues the trial court abused its discretion and erred in changing Child's permanency goal to adoption. Based on our disposition concerning termination, Mother's appeal from the goal change order is moot. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (citing *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002)) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees.").

Even if not moot, we would conclude no relief is due. As noted above, we review a goal change for an abuse of discretion. *In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted). The mandates of 42 Pa.C.S.A. §

6351(f), "clearly place the trial court's focus on the best interests of the child." *Id.* at 978 (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id.* (emphasis in original). As the Supreme Court stated, "the burden is on the child welfare agency . . . to prove that a change in goal would be in the child's best interest." *In re R.I.S.*, 36 A.3d 567, 573 (Pa. 2011).

Mother argues that when the court changed Child's permanency goal to adoption, Mother's "efforts towards her goals and potential for reunification were overlooked in violation of the [Juvenile] Act's primary purpose of family preservation." Mother's Brief at 30. We disagree.

At the time of the hearing on March 30, 2021, Child had been in placement his entire life—approximately 18 months. During that time, Mother failed to timely comply with her objectives. She did not obtain the court-ordered mental health and drug/alcohol assessment until July 22, 2020, after which she failed to obtain the recommended intensive outpatient treatment. *See* N.T., 3/30/21, at 47-48. Accordingly, intensive treatment remained an outstanding object for Mother. *Id.* at 13-16.

With regard to court-ordered services and programs, Mother engaged with ARC only after she was referred for the third time in January 2021. Ms. Roberts testified Mother was then attending parenting classes through ARC, and had completed a housing and an employment assessment. N.T., 3/30/21, at 49. However, Mother's parenting skills remained an issue, as did her

transience and lack of employment, and Ms. Roberts opined that Mother was not in a position to parent Child. On this record, the court found the goal change to adoption was in Child's best interests. ***In re S.B.***, 943 A.2d at 978 ("Safety, permanency, and well-being of the child must take precedence over **all** other considerations."). Accordingly, even if Mother's appeal from the goal change order was not moot, we would discern no abuse of discretion.

Termination decree affirmed. Appeal from goal change order dismissed.

Judge Colins joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2021